UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:22-cr-20048-KMW

UNITED STATES OF AMERICA,
        Plaintiff,

vs.

RIQUELVIS ALFONSECA,
        Defendant.
_____/

**DEFENDANT RIQUELVIS ALFONSECA'S SENTENCING MEMORANDUM
and MOTION FOR DOWNWARD DEPARTURE and VARIANCE**

Riquelvis Alfonseca, by and through his undersigned counsel, hereby files this

Sentencing Memorandum, Motion for Downward Departure and Motion for a Variance under 18

U.S.C. § 3553(a).

**SUMMARY OF THE SENTENCING ARGUMENT**

This Court should depart and vary downward for this hardworking father and upstanding

member of his community who took responsibility for his very minor role in this offense.

**I.  BACKGROUND and PERSONAL HISTORY OF RIQUELVIS ALFONSECA**

Riquelvis is a 44-year father who lives in the Dominican Republic. He spent most of his

life living in a rural area outside the small town in the south of the island. Before his involvement

in this case, he had never been on a boat in his life.

He grew up in abject poverty where he lived with his single mother and siblings in a two

room house with dirt floors and an outdoor latrine. When his mother could no longer support

them, Riquelvis and his brother were sent to live with his father and step mother. Here conditions

went from bad to worse because he was subject to such severe physical abuse that he decided

living homeless on the street was safer. Eventually, he and his brother made it back to his

1

mother's house where he worked any job he could find to support himself like shining shoes, collecting garbage, etc. He continued working through childhood and ultimately made his living as an adult as a motorcycle taxi driver.

When he was a child he had to drop out of school at around the 8th grade because of poverty, but was encouraged by his mother to return to school to get an education. At about the age of 20, he finished his primary school and went on to high school which he graduated from around the age of 30 or 31.
During this time, he was not only working to complete his degree but also raising and supporting a family of his own.

His first child was born was when he was 25 years old and his third daughter about the age of 29. He has been together with the mother of his three children for 20 years.


**Wife and Daughters**


**Riquelvis and Daughters**


**Riquelvis and his Family**

When Riquelvis was in his 30's he went to college with the hopes of escaping poverty and giving his daughters a better life. All of his schooling up to this point was free, but college

was expensive and he could not afford the tuition nor could he get a traditional bank loan on his taxi driver salary, so he took out a "private loan" which for all intents and purposes was from a loan shark. This loan of about $9000 incurred a $100 per month payment which he could not make. After he graduated college in 2018 or 2019, he was simply unable to get a professional job. He worked for one year in a government position at an educational institution, but when the government changed he lost his job. With the mounting bills and the loan shark who was coming to his house threatening physical violence and to remove personal items from the home, he decided to take his family and fled to a larger city farther away looking for work.



**Photo of Riquelvis in Dining Room**



**Riquelvis' current family home**



**Interior Family Home**

## II. OFFENSE CONDUCT

Riquelvis was only in the city for about seven months and was unable to find an office job because he lacked experience and connections so he resorted to working construction and survived on handouts from neighbors. It was at this point that he landed opportunity to participate in this ill-fated drug smuggling trip in the hopes of making money to pay off his debt

and feed his family. But, he had to lie to the recruiters about his ability to navigate a vessel in order to gain passage on the trip. In truth, he had not only never driven a boat before, but had never been on one. On the sea voyage from the Dominican Republic to Colombia, they learned that he couldn't navigate and was useless and threw him off the crew forcing an additional man to come on the smuggling trip. At this time, he not only knew that he was not going to receive any payment, but was hoping he wouldn't be killed for lying when he was returned to the Dominican Republic. This demonstrates the desperation that he was facing when he decided to join this drug conspiracy.

## III. LETTERS OF SUPPORT

Four etters of support have been submitted on Riquelvis' behalf that demonstrate his good character as a hard working family man and also the difficulties he was facing that led him to participate in this crime.

His common law wife describes, "Riquelvis, as a husband is excellent; as a father, he is responsible, loving, a good guide. He spends enough time with them. He talks to them clearly and to the point. He is a man who through great effort and sacrifice managed to graduate from Law School on his own, alone, only with the support of God and a motorcycle he had."

A longtime family friend explains the conversations she had with Riquelvis about his dire financial situation, he told her, "Leudy, help me I cannot take it any more. I have debts, I am being asked to evict the house because I am four months in arrears already, I can no longer feed my family, whatever I earn with my motorcycle is not enough, I am going crazy and I just do not know what to do!" Ultimately, she explains that he had to flee, "I am leaving his province to settle some place else because the man wanted to be paid and said that he would kill him if he returned and could not find the money".

**IV. DETENTION AND CONFINEMENT OF RIQUELIVIS ALFONSECA**

Riquelivis was first detained by the U.S. Coast guard in the Caribbean on January 7, 2022. The Court heard testimony at an evidentiary hearing about the 24 day detention aboard numerous Coast Guard vessels and the harsh conditions he was subject to during that time before Riquelvis arrived to FDC-Miami.

Unfortunately, from his incarceration at FDC beginning in January 2022, until now he has suffered under onerous conditions. First, FDC was still under highly restrictive status due to COVID-19 and Riquelvis was in quarantine numerous times which required almost 24 hours a day lock down. There have also been issues with food at FDC that he reports.

In addition, Riquelvis has suffered from various medical issues at FDC for which he has not been given treatment.  Specifically, he has a growth on his eye that is impairing his vision which can be seen by the appearance of a completely red sclera. He has been told by the medical staff that he needs special eye drops and a surgery, neither of which are being provided and this condition has worsened since he has been in BOP custody. He also suffers from very painful kidney stones which he has not been given any pain medication for. Lastly, he suffers from an umbilical hernia which is present on his stomach and needs surgery to repair. This condition prevents him from using any force or lifting.

U.S. Probation requested these medical records from FDC for the PSIR,  however the institution has failed to respond to the records request as of the date of this filing according to Undersigned Counsel's last communication with Probation on this issue.

The worsening conditions, the overcrowding and the lack of medical care appear to be systemic issues with FDC-Miami. In 2016, the U.S. Office of the Inspector General issued a

report stating that the entire BOP had a critical problem filling medical positions, and that staffing levels in prisons had reached a "crisis level." See Joshua Ceballos, MIAMI NEW TIMES, *Prison Staff Warn of Potential COVID-19 Outbreak in Miami Detention Center*, July 29, 2021, https://www.miaminewtimes.com/news/staffers-warn-of-covid-19-outbreak-at-miami-federal-prison-12630429; and Office of the Inspector General U.S. Department of Justice Review of the Federal Bureau of Prisons' Medical Staffing Challenges, March 2016, https://oig.justice.gov/reports/2016/e1602.pdf.  More recently in December 2021, it was reported that FDC staff filed a complaint with Occupational Safety and Health Administration (OSHA) alleging law enforcement staff were in danger because of staffing shortages at FDC-Miami. See Walter Pavlo, FORBES, *Union Says Staffing Shortages Within Federal Bureau Of Prisons Leading To More Violence*, December 10, 2021, https://www.forbes.com/sites/walterpavlo/2021/12/10/union-says-staffing-shortages-within-federal-bureau-of-prisons-leading-to-more-violence/?sh=481a4f9537a0.

The conditions were so bad at FDC-Miami, that the staff began protesting in the street to spotlight the COVID issues, severe understaffing and inmate assaults. See American Federal of Government Employees website, *Local 501 Protests Unsafe Working Conditions at Miami BOP Facility*, August 2021, https://www.afge.org/article/local-501-protests-unsafe-working-conditions-at-miami-bop-facility/. This appears to still be an issue as of mid-2022. See Joshua Ceballos and Alex Deluca, MIAMI NEW TIMES, Employees at Understaffed Miami Prison Say Inmates, Guards, and Public Are at Risk, May 24, 2022, https://www.miaminewtimes.com/news/fdc-miami-staffing-shortage-spurs-complaints-from-inmates-and-prison-guards-14521728#. It appears that Riquelvis' reporting of harsh conditions at FDC are supported by these other sources.

**V. REQUEST FOR SPECIFIC DEPARTURES**

    **A. Departure for Pretrial Confinement Pursuant to U.S.S.G. § 5K2.0**

Many courts have recognized and applied a Downward Departure pursuant to U.S.S.G. § 5K2.0 for harsh and severe conditions spent in pretrial or presentence confinement. See U.S. v. Carty, 264 F.3d 191 (2d Cir. 2001)(finding that defendant's pre-sentence confinement in Dominican Republic where conditions were bad may be a permissible basis for downward departure). The Court in Carty stated, the Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case "outside the heartland of the applicable Guideline." According to the Sentencing Guideline Manual, a sentencing court may depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. 3553 (b)). No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. See United States v. Francis, 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001)("Accordingly, we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.")

Our own 11th Circuit Court of Appeals first recognized this departure in U.S. v. Pressley, 345 F.3d 1205 (11th Cir. 2003)(where the defendant spent six years in presentence confinement, including 5 years in 23-hour a day lockdown and where he had not been outside in 5 years, district court erred in holding that departure not available) and stated, "Conditions of

confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guideline." In this district, the granting of a downward departure has been based upon the conditions of pretrial confinement in BOP facilities. For example, in United States v. Noriega, 40 F. Supp. 2d 1378 (S.D.F.L. 1999), Judge Hoeveler reduced the defendant's sentence from 40 years to 30 years based upon the nature of his confinement. Id. at 1380-81. In this case the Court recognized that Noriega was in relative isolation not as a result of his misconduct and didn't have access to television or exercise, etc. finding that "[t]here is little question that this is a more difficult ('harder') type of confinement than in general population." Id. at 1379. See also United States v. Hernandez-Santiago, 92 F.3d 97, 101 n.2 (2d Cir. 1996) (noting that the district court granted a downward departure of three levels based on defendant's twenty-two months of incarceration in a state facility, which was a "'harsher incarceration'").

As explained above, Riquelvis has been subject to harsh and severe conditions first for numerous weeks aboard various vessels on his way to Miami for prosecution and then for over a year at FDC-Miami because of numerous, lengthy quarantine periods as a result of COVID-19, meal shortages, food poisoning and lack of medical treatment. It is also clear that FDC-Miami is understaffed in these areas and overcrowded making the detention conditions so bad even the staff members are protesting. He has been under harsh conditions for almost a year and a half, since his arrest in January 2022. At this time the Court should consider this particular situation out of the "heartland" of cases and one that warrants not only the day for day credit for the time he already served but *additional* credit by way of a separate downward departure for pretrial confinement.

**B. Downward Departure Because Riquelvis Alfonseca is Not a US Citizen and Eligible for Programs or Early Release**

As explained above, Riquelvis was brought to this Country by the United States Government for prosecution, however Riquelvis will not be treated the same as other federal prisoners who are US citizens or residents and therefore, will receive a much more severe sentence because of this. For example, the Bureau of Prisons will not release Riquelvis early because as a Dominican citizen he is not eligible for a half-way-house or any other early release program. Accordingly, he may serve up to 18 months more than prisoners who are not deportable aliens. After he serves his full sentence, he will be transported to an immigration detention center and his incarceration will continue there until he is returned to his country.

18 U.S.C. § 3624(c) provides that the Bureau of Prisons assures that a prisoner serving a term of imprisonment spend a reasonable part, not to exceed six months of the last ten percent of his sentence, to be served in home confinement or half-way house. This provision does not apply to deportable aliens. Larty v. Department of Justice, 790 F.Supp 130 (W.D.La. 1992) and United States v. Smith, 27 F.3d 649 (US DC Cir. 1994) and United States v. Soto, 976 F. Supp. 1367 (D.Or. 1997). The sentence the Court imposes should include a reduction by the Court of at least these six months after determining the initial guideline sentence, especially in this case as Riquelvis did not voluntarily come to this country.

## VI. REQUESTS FOR DOWNWARD VARIANCE

The 18 U.S.C. § 3553(a) factors should also be considered when determining the appropriate sentence for Riquelvis Alfonseca. In United States v. Booker, 125 S.Ct. 738 (2005), the Supreme Court excised that part of the Sentencing Reform Act that made the guidelines mandatory and modified it to make the Guidelines effectively advisory. It requires a sentencing court to consider Guideline ranges, but it permits the court to tailor the sentence in light of other

statutory concerns as well. 18 U.S.C. § 3553(a) now governs federal sentencing. It requires

courts to "impose a sentence sufficient, but not greater than necessary, to comply with the

purposes set forth in paragraph 2."

All the same basis described above that warrant a departure also should be considered for

a variance: harsh pretrial confinement, etc. Specifically, relying on 18 U.S.C. § 3553(a)(2) courts

have authorized downward variances from the Guidelines based on deplorable conditions of

pretrial confinement. *See*, e.g. <u>United States v. Jayyousi</u>, 657 F.3d 1085, 1118-19 (11th Cir.

2011); <u>United States v. Sutton</u>, No. 07-426, 2007 WL 3170128 (D.N.J. Oct. 25, 2007); and

<u>United States v. Jose Padilla</u>, Case No. 04-Cr-60001-MGC (S.D.F.L., September 9, 2014)

(following remand, granting a 108-month variance due to harsh conditions of confinement in a

military brig).

**A. Zero Point Offender**

The 2023 Criminal History Guideline Amendments to take effect on November 1, 2023.

If sentenced under the future guidelines, Riquelvis would be a "zero-point offender" as he has

zero criminal history points thereby reducing his guidelines by an additional 2 levels.  This is a

basis for a downward variance. Numerous district judges in the Southern District of Florida have

already granted variances based upon this upcoming amendment.[1]

---

[1] United States v. Christian Pena Encarnacion, 22-20422-DMM; United States v. Robles, 22-20494-RNS; United States v. Palomino, 22-20501-BB; US v. del Pozo,  22-cr-20429-Scola; US v Angel Alexis Garces, 22-20422-DMM; US v. Crystal Estrada Marquez, 22-20595-DMM; US v. Alejandro Catano Velasquez, 22-CR-60207-AHS; United States v. Solchys Perez et al. 22-cr-20534; USA v  Isaac McNeal, 22-20467-CR-GAYLES; US v Da Costa 22-20534-DMM; US v. Luckny Vincent, 23-CR-80027-RLR; United States v Carlos Sablón, 22-20341- JEM; US v Javier Ortiz, 22-cr-10001-Gayles.

**B. Nature and Circumstances of the Offense**

Although this case involves is a serious drug offense, Riquelvis' participation was limited to a very minor role in this offense as discussed in the Objections to the PSR because of his lack of navigation skills. Further, the amount of cocaine involved in this case was 315 kilograms, which is less than the typical amount in these type of Title 46 cases that is normally well over 450 kilograms, the maximum accounted for in guidelines.

**C. History and Characteristics of the Defendant**

The Court should consider Riquelvis' long history of work and good characteristics including being a well-respected father. As discussed in more detail above in section I and in the letters submitted on his behalf, "hardworking" probably understates Riquelvis' character which is demonstrated by his years of working many jobs to support his family and finishing his degree around the age of 40.

The Court should recognize his entire life history and understand he has not lived the life of privilege and had to struggle to support his family. Lastly, the motivation for his participation in this crime was one of desperation due to the threats he was facing because of his financial situation. Therefore, the Court should consider his personal history and characteristics as a basis to vary downward.

**D. Unwarranted Sentencing Disparities**

18 U.S.C. § 3553, also requires the Court to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. See United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009); United States v. Spoerke, 568 F.3d 1236, 1252 (11th Cir. 2009). In Riquelvis' case, probation will likely calculate the sentencing guidelines to be 31 (after application of the Safety Valve), corresponding to 108-

135 months. Such a range is not in line with the sentences of other, similarly-situated defendants have received in this District.

This Court recently sentenced a similarly situated Title 46 defendant convicted in a cocaine conspiracy involving 556 kilograms to a 35 month sentence. See Michael Espinoza Tenorio (20-CR-20218-KMW). This Court also sentenced Willington Wilder Gomez Pinto (16-CR-20381-KMW) to 48 months. In another case from 2019, Gregorio Renteria Bravo (19-CR-20042-SCOLA) was sentenced to 60 months–well below the proposed sentencing range–after transporting 1,800 kilograms of cocaine. In Riquelvis' case the amount of cocaine involved is less than all these defendants and his sentence should therefore be proportionately less.

WHEREFORE, the Defendant, Riquelvis Alfonseca, requests this Court take into consideration the foregoing circumstances and legal authorities in determining an appropriate and just sentence for him.

Respectfully submitted,

Counsel for Riquelvis Alfonseca
SHERRI A. ROMANO, P.A
28 West Flagler Street, Suite 304
Miami, FL 33130
Tel: 305-441-9858
Fax: 786-471-7998
E-mail: sromano@sarpalaw.com
BY: /s/ Sherri A. Romano
Florida Bar No.: 317380

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this _19___ day of __June_____, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

BY: /s/ Sherri A Romano